891 A.2d 336

**TOMRAN, INC.**

v.

**William M. PASSANO, Jr., et al.**

**No. 3, Sept. Term, 2005.**

Court of Appeals of Maryland.

Feb. 6, 2006.

Cyril V. Smith (P. Andrew Torrez, Zuckerman Spaeder LLP, Baltimore, Charles J. Piven, Marshall N. Perkins, Law Offices of Charles J. Piven, P.A., Baltimore, on brief), for petitioner.

Robert B. Mazur (Michael W. Schwartz, John F. Lynch, Wachtell, Lipton, Rosen & Katz, New York City, Andrew Jay Graham, Stuart M.G. Seraina, Kramon & Graham, P.A., Baltimore, James D. Mathias, Robert A. Gaumont, DLA Piper Rudnick Gray Cary US LLP, Baltimore), Mark D. Gately (Hogan & Hartson, L.L.P., Baltimore, on brief), for respondents.

Argued before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

BATTAGLIA, J.

This case arises out of one of the Allfirst Bank scandals and presents this Court with issues of procedure, contractual interpretation, and the application of Irish law. Specifically, Petitioner, Tomran Inc. ("Tomran"), has requested that this

Court review the Court of Special Appeals' affirmance of the Circuit Court's dismissal of the first amended complaint, including its findings that the choice of law clause in the Deposit Agreement did not govern the institution of shareholder derivative suits, that Irish law would not recognize Tomran's cause of action, and that the Circuit Court did not abuse its discretion in denying Tomran's post-judgment motion to further amend the complaint. We shall affirm.

## Factual and Procedural History

Allied Irish Bank ("AIB") is a company incorporated under the laws of Ireland that is publicly traded on the New York Stock Exchange. AIB wholly owned Allfirst Financial, a Delaware corporation with its headquarters in Baltimore, which in turn was the sole owner of several subsidiaries, including Allfirst Bank, a financial institution with its principal place of business in Baltimore.

On February 6, 2002, Allfirst Bank revealed that it had discovered that a foreign currency trader in its employ, John Rusnak, had systematically falsified bank records and other documents accruing losses from non-existent option contracts and recording illusory premiums from them as profits. This caused Allfirst Bank to revise its earnings downward by nearly $700 million.

Tomran, Inc., a Maryland corporation based in Jarrettsville, is a depositor in Allfirst Bank and holder of American Depositary Receipts ("ADRs") of stock in AIB worth over $100,000. ADRs have been succinctly defined by the United States Court of Appeals for the Third Circuit in *Pinker v. Roche Holdings Ltd.*, 292 F.3d 361 (3d Cir.2002):

An ADR is a receipt that is issued by a depositary bank that represents a specified amount of a foreign security that has been deposited with a foreign branch or agent of the depositary, known as the custodian. The holder of an ADR is not the title owner of the underlying shares; the title owner of the underlying shares is either the depositary, the custodian, or their agent. ADRs are tradeable in the same manner as any other registered American security, may be

listed on any of the major exchanges in the United States or traded over the counter, and are subject to the Securities Act and the Exchange Act. This makes trading an ADR simpler and more secure for American investors than trading in the underlying security in the foreign market.

ADRs may be either sponsored or unsponsored. An unsponsored ADR is established with little or no involvement of the issuer of the underlying security. A sponsored ADR, in contrast, is established with the active participation of the issuer of the underlying security. An issuer who sponsors an ADR enters into an agreement with the depositary bank and the ADR owners. The agreement establishes the rights and obligations of the parties, such as ADR holders' voting rights.

*Id.* at 367 (citations omitted).

After Allfirst Bank announced its earnings restatement resulting from the Rusnak fraud, Tomran made a demand on the boards of directors of AIB and Allfirst Bank that they take action to recoup the losses. The boards denied Tomran's demand.

On May 13, 2002, Tomran filed a derivative suit for money damages and declaratory and injunctive relief against the directors and senior officers of Allfirst Bank and nominal defendants, AIB, Allfirst Bank, and Allfirst Financial.[1] On August 14, 2002, Tomran amended its complaint to state the

---

1. Those directors and officers are William M. Passano, Jr.; Frank P. Bramble; Susan C. Keating; David M. Cronin; Sherry F. Bellamy; James T. Brady; Jeremiah E. Casey; Edward A. Crooke; John F. Dealy; William T. Kirchhoff; Henry J. Knott, Jr.; Andrew Meier, II; Morton I. Rapoport; Michael J. Sullivan and Rhoda M. Dorsey. All of the financial institutions and the officers and directors, with the exception of David M. Cronin, joined in a single brief. When this opinion refers to "officers and directors," it shall refer to all of the officers and directors including Mr. Cronin. Mr. Cronin filed a separate brief focusing on Article IX of Allfirst's corporate charter, which prohibits demands for monetary damages against officers and directors "to the fullest extent permitted by Maryland law," and joined in the arguments presented by the other individual and institutional defendants. Because we determine that Tomran lacks a cause of action on other

action as a "triple derivative" suit.[2] The amended complaint alleged that Respondents were negligent and grossly negligent in their oversight of Rusnak's foreign currency dealings, which directly caused the loss to Allfirst Bank.[3] In its amended complaint, Tomran argued that, as a result of the change in the charter, the officers and directors of Allfirst Bank were no longer "personally liable to the Bank or its shareholders for money damages."[4] Thus, Tomran sought a declaratory judgment "confirming that the change in the Bank's articles was

grounds, we do not reach the arguments contained in Mr. Cronin's individual brief.

2. In its amended complaint, Tomran stated that "[i]t is a triple derivative action because the claims for money damages are brought for the direct benefit of Allfirst Bank—and indirectly, for the benefit of its parent companies, nominal defendants Allfirst Financial and [AIB]—against certain of Allfirst Bank's directors and officers, and no claims of wrongdoing or liability are asserted against Allfirst Bank or the other nominal corporate defendants."

When M & T Bank Corporation acquired Allfirst Financial, this action became a single derivative suit on behalf of AIB. As explained by the officers and directors in a letter to the Circuit Court, "the merger agreement does absolutely nothing to interfere with this action. To the precise contrary, it expressly provides for the assignment of Allfirst Financial's and Allfirst Bank's Rusnak-related claims against the individual defendants to AIB.... Accordingly, if the merger is approved, and if this action still exists, the action's multiple derivative nature will be obviated." On April 1, 2003, AIB announced that it sold all of its interest in Allfirst Financial to M & T Bank Corporation.

3. Because this is a derivative shareholder action, any monetary recovery would be awarded to AIB.

4. Allfirst Bank changed its charter from a national banking association to a commercial bank pursuant to Maryland Code (1980, 2003 Repl. Vol.), Title 3 of the Financial Institutions Article. Relevant to Tomran's allegations in its complaint, Article IX of the revised charter states:

To the fullest extent permitted by Maryland law, as amended or interpreted, no director or officer of the Bank shall be personally liable to the Bank or its shareholders for money damages. No amendment of these Articles of Incorporation or repeal of any of the provisions shall limit or eliminate the benefits provided to directors or officers under this Article IX with respect to any act or omission which occurred prior to such amendment or repeal.

Maryland Code (1975, 1999 Repl.Vol.), Section 2–405.2 of the Corporations and Associations Article provides for limited director and officer liability. It states:

not retroactive and did not cover the $40 million in losses already in place as of December 1998." It also sought to enjoin Respondents "from asserting that their liability to the Bank [was] limited in any fashion by the December 1998 transaction."

All of the officers and directors filed motions to dismiss on the following grounds: that Tomran had failed to state a claim upon which relief could be granted; that Maryland courts did not have jurisdiction over the case; that Tomran had no derivative cause of action; and that Allfirst Bank's charter barred Tomran's claims. At the hearing on the motions to dismiss, both parties presented affidavits and deposition testimony from their respective experts on Irish law, Michael Ashe, for the Respondents, and Eoin McCullough, for the Petitioner.

In his December 30, 2002 opinion, Judge Albert J. Matricciani, sitting in the Circuit Court for Baltimore City, determined that the complaint failed to state a claim upon which relief could be granted. Moreover, Judge Matricciani determined that Irish law should apply "in determining the sustainability of [Tomran's] claims in this case." He stated:

where the Court has held that the internal affairs

---

The charter of the corporation may include any provision expanding or limiting the liability of its directors and officers to the corporation or its stockholders as described under § 5–418 of the Courts and Judicial Proceedings Article.

Section 5–418 of the Courts and Judicial Proceedings Article provides that a charter may "limit[ ] the liability of its directors and officers ... for money damages," but it permits recovery under two circumstances:

(1) To the extent that it is proved that the person actually received an improper benefit or profit in money, property, or services for the amount of the benefit or profit in money, property, or services actually received;

(2) To the extent that a judgment or other final adjudication adverse to the person is entered in a proceeding based on a finding in the proceeding that the person's action, or failure to act, was the result of active and deliberate dishonesty and was material to the cause of action adjudicated in the proceeding[.]

doctrine [5] does not pose a complete bar to its exercise of jurisdiction over the internal affairs of a foreign corporation, it is unwilling to go farther and ignore the well settled principles that underlie that doctrine and require that the law of the place of incorporation govern the rights and responsibilities of the parties with respect to its internal operations.

The court found that Tomran, to maintain the action, was required to establish: (1) that it is entitled, "as a beneficial owner of AIB shares rather than a registered shareholder," to bring a derivative suit against AIB; (2) that the amended complaint "set forth allegations sufficient to constitute a 'fraud on the minority' exception to the rule in the case of *Foss v. Harbottle*, [1843] 2 Hare 461, which stands for the general proposition under Irish law that even registered shareholders may not maintain an action on behalf of the company"; and (3) that "Irish law would permit a triple derivative action." [6]

With respect to the first requirement, the court found that Tomran could not proceed because no Irish case has permitted a beneficial owner of shares to maintain a derivative suit. As to the second prerequisite, the court determined that "it was unlikely that the bald allegations contained in ... the first amended complaint would satisfy an Irish court that the 'fraud on the minority' exception ... has been pled adequately." The Circuit Court found with respect to the third requirement that there was no authority to suggest that "Ireland is about to permit double or triple derivative actions by even regis-

---

5. As this Court described in *N.A.A.C.P. v. Golding*, 342 Md. 663, 674, 679 A.2d 554, 559 (1996), quoting *Edgar v. MITE Corp.*, 457 U.S. 624, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982):

 [t]he internal affairs doctrine is a conflict of laws principle which recognizes that only one State should have the authority to regulate a corporation's internal affairs—matters peculiar to the relationships among or between the corporation and its current officers, directors, and shareholders—because otherwise a corporation could be faced with conflicting demands.

 *See also Gilman v. Wheat, First Securities Inc.*, 345 Md. 361, 370–71, 692 A.2d 454, 459 (1997).

6. At the time of the Circuit Court's ruling, the merger and acquisition of Allfirst Financial by M & T Bank Corporation had not been approved, which later rendered this issue moot because the sale of Allfirst Financial resulted in a single derivative action as opposed to a triple derivative action.

tered shareholders." Thus, the Circuit Court concluded that Tomran's request for a declaratory judgment and injunction was "rendered moot by the [c]ourt's determination that [Tomran cannot] bring this action."

Tomran filed a motion to amend the complaint and two motions requesting that Judge Matricciani alter or amend his judgment. Subsequent to Judge Matricciani's denial of all of the post-hearing motions, Tomran noted a timely appeal to the Court of Special Appeals.

The Court of Special Appeals held that the choice of law provision in the Deposit Agreement[7] could not be read so broadly as to encompass the right to maintain a derivative suit, and therefore, under the internal affairs doctrine, Irish law applied because AIB was incorporated in Ireland. Moreover, the intermediate appellate court determined that under Irish law an ADR holder lacked the right to bring a derivative suit, and even if it did have such a right, the allegations of negligence in the complaint were insufficient under Irish law to maintain a derivative suit based on the "fraud on the minority" exception in *Foss v. Harbottle,* [1843] 2 Hare 461. On January 18, 2005, Tomran filed a petition for writ of certiorari with this Court and presented the following issues for our consideration, which we have rephrased and renumbered for clarification purposes:

1. Whether the Court of Special Appeals erred in determining that the choice of law clause in the Deposit Agreement did not govern the determination of whether Tomran had the right to sue derivatively;

2. Whether the Court of Special Appeals erred in holding that Tomran would not have a cause of action under Irish law, thereby affirming the Circuit Court's dismissal; and

---

7. Section 7.6 of the Deposit Agreement provides:
 *Governing Law.* This Deposit Agreement and the Receipts shall be interpreted and all rights hereunder and thereunder and provisions hereof and thereof shall be governed by the laws of the State of New York.

**10**

3. Whether the Court of Special Appeals erred in upholding the Circuit Court's denial of Tomran's post-judgment motion to amend the first amended complaint.

On April 7, 2005, we granted the petition and issued the writ. *Tomran v. Passano*, 386 Md. 180, 872 A.2d 46 (2005).

Based upon our analysis of the choice of law clause in the Deposit Agreement, we determine that the phrase "hereunder and thereunder" limits the scope of the choice of law provision to the rights enumerated explicitly in the Deposit Agreement and ADR Receipts and matters of contract enforceability. The issue of whether Tomran has a cause of action to sue derivatively on behalf of AIB is not governed by the Deposit Agreement or the ADR Receipts and thus, the choice of law clause does not apply. As such, under the internal affairs doctrine, an analysis of Irish law determines whether Tomran possesses a right to bring a derivative suit on behalf of AIB. We find that under the current state of Irish law Tomran would not be entitled to pursue this derivative action as a beneficial shareholder, and we hold that the Circuit Court did not abuse its discretion in denying the proffered post-judgment amendment to the first amended complaint. Therefore, we shall affirm.[8]

---

8. Generally the introduction of affidavits of fact will operate to convert a motion to dismiss into a motion for summary judgment. *See Beyond Systems Inc. v. Realtime Gaming*, 388 Md. 1, 12 n. 10, 878 A.2d 567, 574 n. 10 (2005); *Green v. H & R Block, Inc.*, 355 Md. 488, 501, 735 A.2d 1039, 1047 (1999). In the present case, the affidavits introduced by the parties in conjunction with their motions to dismiss and opposition thereto solely addressed the interpretation of Irish law.

Under Maryland law the determination of foreign law is a legal question for the court to decide, as opposed to a question of fact. *See* Md.Code (1973, 2002 Repl.Vol.), §§ 10–501 to 10–505 of the Courts and Judicial Proceedings Article. As such, the consideration of the affidavits did not convert the motion to dismiss into a motion for summary judgment because the application of foreign law in this particular case is a legal issue for the court to decide pursuant to Maryland Code (1973, 2002 Repl.Vol.), Section 10–503 of the Courts and Judicial Proceedings Article, which is determinative of whether Tomran has stated a legally sufficient claim. *See Porterfield v. Mascari II, Inc.*, 374 Md. 402, 413–14, 823 A.2d 590, 597 (2003), citing *Morris v. Osmose Wood Preserving*, 340 Md. 519, 531, 667 A.2d 624, 631 (1995) (stating

## Discussion

Tomran presents three arguments for this Court's consideration. First, Tomran argues that the choice of law provision of the Deposit Agreement mandates the application of New York law to the determination of whether Tomran can pursue a derivative action on behalf of AIB. To this end, Tomran asserts that the language "hereunder and thereunder" in the clause, which more fully states,

Section 7.6—*Governing Law.* This Deposit Agreement and the Receipts shall be interpreted and all rights hereunder and thereunder and provisions hereof and thereof shall be governed by the laws of the State of New York.

does not limit the scope of the choice of law clause to those rights enumerated in the Deposit Agreement and Receipts. Alternatively, Tomran contends that the choice of law clause is ambiguous and as such, under Maryland law, it must be construed in its favor and against the Respondents who, according to Tomran, drafted it.

Tomran also argues that the lower courts erred in their determination that Irish law would not recognize the right of a beneficial owner of shares to bring a derivative suit. Accordingly, Tomran states that the Court of Special Appeals applied an erroneous standard because it required a preexisting case or statute recognizing such a right for that court to do so as well. Tomran contends that because the Irish courts, and their English predecessors, recognized and protected other rights of beneficial owners, the Court of Special Appeals should have concluded that the Irish courts would also extend derivative rights to those owners.

Furthermore, Tomran asserts that it adequately pled the requirements of the "fraud on the minority" exception. It argues that because AIB's Board of Directors is vested with

that "[a] defendant asserts in such a motion that, despite the truth of the allegations, the plaintiff is barred from recovery as a matter of law," and thus, "[w]e must determine on review whether, on its face, the amended complaint in this case pleads a legally sufficient cause of action").

complete control over the company's affairs under the articles of incorporation, the Board may properly be considered a majority in control of the company. Moreover, Tomran contends that the Board's refusal to initiate a lawsuit constituted a "fraud" on the minority. Tomran alleges that AIB's Board was as culpable for the $700 million loss as the Board of Allfirst Bank and that the language of AIB's insurance policy contained an exclusion which prevented recovery if a direct suit, as opposed to a derivative action, was pursued.

Finally, Tomran argues that it should have been permitted to amend its complaint post-judgment to add the Bank of New York, the title holder to AIB's shares, as an additional party and make additional allegations regarding the "fraud on the minority" issue.

Conversely, Respondents argue that the choice of law clause in the Deposit Agreement limits the application of New York law to those rights explicitly stated in the Deposit Agreement or the Receipts themselves, and neither the Deposit Agreement nor the Receipts grants ADR holders the right to sue derivatively. Moreover, even if this Court were to determine that the clause is ambiguous, Respondents assert, there is no allegation that Respondents drafted the Deposit Agreement, thereby causing the ambiguity to be construed against them.

Respondents contend that the internal affairs doctrine, the principle stating that disputes concerning the relationships among corporation, its directors, officers, and shareholders must be governed by the law of the jurisdiction of incorporation, requires that Irish law govern the right to sue derivatively. Moreover, they argue that the Court of Special Appeals did not create a standard that was discriminatory against parties seeking to rely on foreign law, as Tomran asserted, but rather, that the intermediate appellate court considered the evidence and arguments presented by the parties and reached a carefully reasoned conclusion. Respondents also note that there is nothing in the applicable cases or treatises indicating that Irish courts would grant Tomran the right to proceed.

Respondents also argue that even if Tomran were entitled to sue, its claim would fail to satisfy the "fraud on the minority" rule. Respondents assert that "fraud on the minority" only applies when a shareholder can show that the alleged wrongdoers themselves control a majority of the vote, or that a voting majority improperly blocked the proposed action, and that Tomran did not plead apposite facts. They also contend that the charges made against AIB's Board of Directors do not constitute an affirmative abuse of fiduciary powers that harms the company and benefits the directors and officers personally as required under the rule.

### The Meaning of "hereunder and thereunder"

██ Tomran argues that the choice of law provision in the Deposit Agreement mandates the application of New York law to determine whether it may proceed in a derivative suit on behalf of AIB because under its terms the choice of law provision encompasses "all rights." We disagree.

 Section 7.6 of the Deposit Agreement provides:

*Governing Law.* This Deposit Agreement and the Receipts shall be interpreted and all rights hereunder and thereunder and provisions hereof and thereof shall be governed by the laws of the State of New York.

Maryland follows the objective law of contract interpretation and construction. *Owens–Illinois, Inc. v. Cook,* 386 Md. 468, 496, 872 A.2d 969, 985 (2005); *Taylor v. NationsBank, N.A.,* 365 Md. 166, 178–79, 776 A.2d 645, 653 (2001); *Wells v. Chevy Chase Bank, F.S.B.,* 363 Md. 232, 251, 768 A.2d 620, 630 (2001). We have explained:

A court construing an agreement under this test must first determine from the language of the agreement itself what a reasonable person in the position of the parties would have meant at the time it was effectuated. In addition, when the language of the contract is plain and unambiguous there is no room for construction, and a court must presume that the parties meant what they expressed. In these circumstances, the true test of what is meant is not what the

parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it meant. Consequently, the clear and unambiguous language of an agreement will not give [way] to what the parties thought that the agreement meant or intended it to mean.

*General Motors Acceptance Corp. v. Daniels,* 303 Md. 254, 261, 492 A.2d 1306, 1310 (1985) (citations omitted). The cardinal rule of contract interpretation is to give effect to the parties' intentions. *Owens–Illinois,* 386 Md. at 497, 872 A.2d at 985. Moreover, this Court has adhered to the principle that we will not unnecessarily read contractual provisions as meaningless:

A recognized rule of construction in ascertaining the true meaning of a contract is that the contract must be construed in its entirety and, if reasonably possible, effect must be given to each clause so that a court will not find an interpretation which casts out or disregards a meaningful part of the language of the writing unless no other course can be sensibly and reasonably followed.

*National Union v. David A. Bramble, Inc.,* 388 Md. 195, 209, 879 A.2d 101, 109 (2005), quoting *DIRECTV, Inc. v. Mattingly,* 376 Md. 302, 320, 829 A.2d 626, 637 (2003), quoting in turn *Sagner v. Glenangus Farms, Inc.,* 234 Md. 156, 167, 198 A.2d 277, 283 (1964). *See also Bausch & Lomb, Inc. v. Utica Mut. Ins. Co.,* 330 Md. 758, 782, 625 A.2d 1021, 1033 (1993); *Dahl v. Brunswick Corp.,* 277 Md. 471, 478–79, 356 A.2d 221, 226 (1976).

Imbued with its ordinary, plain meaning and read in the context of the choice of law provision, "hereunder and thereunder" must be viewed as referring to the rights set forth in the Deposit Agreement and Receipts. Based upon the grammatical and syntactical structure of the clause, "hereunder" must concern the rights and obligations contained within the Deposit Agreement, which is the document where the choice of law clause appears. Similarly, "thereunder" must reference the terms embodied in the Receipts, which are the only other

documents listed and which appear after the Deposit Agreement in the clause. Therefore, we conclude that the only reasonable interpretation of "hereunder and thereunder" is one wherein the phrase limits the scope of the choice of law provision to those rights enumerated in the Deposit Agreement and Receipts.

The United States Court of Appeals for the Ninth Circuit in *Batchelder v. Kawamoto*, 147 F.3d 915 (9th Cir.), *cert. denied* 525 U.S. 982, 119 S.Ct. 446, 142 L.Ed.2d 400 (1998), reached the same conclusion when presented with a choice of law clause that was substantively identical to the clause at issue in the case *sub judice*. In *Batchelder*, the choice of law clause provided:

This Deposit Agreement and the Receipts and all rights hereunder and thereunder and provisions hereof and thereof shall be governed by and construed in accordance with the laws of the State of New York, United States of America. It is understood that notwithstanding any present or future provision of the laws of the State of New York, the rights of holders of Stock and other Deposited Securities, and the duties and obligations of the Company in respect to such holders, as such, shall be governed by the laws of Japan.

The Ninth Circuit stated that "[t]he first sentence of § 7.07 provides that contract rights contained in the Deposit Agreement itself or in the ADR certificates as well as the construction of the Deposit Agreement, are to be governed by the laws of New York." *Id.* at 918. The Ninth Circuit did not make its interpretation of the scope of the first sentence contingent upon the existence of the second sentence as Tomran asserts.

The court continued to explain its reasoning by stating that Batchelder, in attempting to assert a right that is not "expressly granted" to him by the Deposit Agreement, the second sentence "directs this court to apply Japanese law to determine the existence and scope of Batchelder's right." *Id.* Although the second sentence is dispositive in *Batchelder*, the Ninth Circuit noted that even if the second sentence was not

included in the clause, it would be bound to apply Japanese law under the "internal affairs" doctrine, which provides that the law of the jurisdiction of incorporation governs the rights and responsibilities of the corporation and its shareholders. *Id.* at 920. Thus, according the Ninth Circuit, Japanese law would have applied in *Batchelder* regardless of the second sentence in the choice of law provision. Therefore, our analysis is consistent with the opinion in *Batchelder.*

Our determination also is consistent with those jurisdictions that have considered the meaning of "hereunder and thereunder" in the choice of law context, in arbitration clauses, and in forum selection clauses. *See, e.g., Rochdale Village, Inc. v. Public Service Employees Union,* 605 F.2d 1290, 1296 (2d Cir.1979) (holding that "[t]he insertion of the word 'hereunder' after the otherwise all-inclusive phrase 'any and all disputes' has the effect of limiting, albeit slightly, the parties' duty to arbitrate. All disputes arising 'under' the agreement are to be arbitrated; those that are collateral to the agreement are not."); *Desktop Images, Inc. v. Ames,* 929 F.Supp. 1339, 1345 (D.Colo.1996) (stating that use of "thereunder" in the arbitration clause limits its application to those claims based upon the terms of the contract); *Hoffman v. Minuteman Press Int'l Inc.,* 747 F.Supp. 552, 559 (W.D.Mo.1990) ("The 'hereunder' language in these franchise agreements limits application of the forum selection clause to suits arising under the agreement and seeking enforcement of the agreement").

Had the parties intended the choice of law clause to govern "all rights," as Tomran urges, there would be no need to include the phrases "hereunder and thereunder" in the clause. Thus, were we to conclude that the clause applied to "all rights," regardless of their inclusion in the Deposit Agreement or Receipts, we would be rendering the phrase "hereunder and thereunder" nugatory. Moreover, Tomran's interpretation of the choice of law clause would result in the creation of two classes of derivative plaintiffs: beneficial shareholders, whose rights are governed by New York law, which presumably is more favorable to those plaintiffs and would permit Tomran to proceed, and AIB's normal shareholders, whose

actions would be governed by the more stringent Irish law. We will not adopt such a position. Therefore, we find that "hereunder and thereunder" limits the scope of the choice of law clause to those rights specifically stated in the Deposit Agreement and the Receipts. Because neither the Deposit Agreement nor the Receipts by their terms provide Tomran with the right to sue derivatively, we determine that the choice of law provision does not apply to the issue of whether Tomran has the right to sue derivatively.

## The Internal Affairs Doctrine

██ Because the choice of law clause does not apply, we must determine which jurisdiction's law should govern Tomran's right to proceed. For guidance we turn to the internal affairs doctrine. The internal affairs doctrine provides that the law of the jurisdiction of incorporation governs the rights and responsibilities of the parties involved. *See Gilman v. Wheat, First Securities Inc.,* 345 Md. 361, 370–71, 692 A.2d 454, 459 (1997); *N.A.A.C.P. v. Golding,* 342 Md. 663, 674, 679 A.2d 554, 559 (1996); *Stockley v. Thomas,* 89 Md. 663, 43 A. 766 (1899).

Courts first developed the internal affairs doctrine in the 1860s. Frederick Tung, *Lost In Translation: From U.S. Corporate Charter Competition to Issuer Choice in International Securities Regulation,* 39 GA. L. REV. 525, 543 (2005). In its earliest explication, the doctrine embodied the recognition that "a corporation's internal disputes implicated the territorial sovereignty of the incorporating state," which "reflected the historically intimate legal, economic, and geographical ties between the corporation and its incorporating state." *Id.* Each corporation was a creature of statute and was treated as existing only within the boundaries of the state of incorporation. *Id.* at 544.

As transportation and communication were facilitated in the middle of the nineteenth century, interstate corporations arose and the Commerce Clause was construed as preventing states from enacting protectivist legislation. *Id.* It was at this time that courts first delineated the internal affairs doctrine, "de-

ferring to the territorial sovereignty of the incorporating state regarding the internal matters of its corporations." *Id.* The internal affairs doctrine remains in force today. As described by this Court in *N.A.A.C.P. v. Golding*, 342 Md. 663, 674, 679 A.2d 554, 559 (1996), quoting *Edgar v. MITE Corp.*, 457 U.S. 624, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982):

> [t]he internal affairs doctrine is a conflict of laws principle which recognizes that only one State should have the authority to regulate a corporation's internal affairs—matters peculiar to the relationships among or between the corporation and its current officers, directors, and shareholders— because otherwise a corporation could be faced with conflicting demands.

*See also Gilman v. Wheat, First Securities Inc.*, 345 Md. 361, 370–71, 692 A.2d 454, 459 (1997). Therefore, because, as the parties agree, AIB is an Irish corporation, Irish law governs whether Tomran may maintain a derivative suit on AIB's behalf.

### Irish Company [9] Law

Tomran asserts that when the Court of Special Appeals and the Circuit Court determined that Irish law applied, they were obligated to determine the way that foreign jurisdiction would rule under Maryland Code (1973, 2002 Repl. Vol.), Section 10–501 of the Courts and Judicial Proceedings Article. That provision states:

> Every court of this State shall take judicial notice of the common law and statutes of every state, territory, and other jurisdiction of the United States, and of every other jurisdiction having a system of law based on the common law of England.

Specifically, Tomran contends that both the Circuit Court and the Court of Special Appeals created a rule that discriminates against parties who wish to have foreign law applied and that is impermissibly rigid in that it requires clear legal authority

---

9. Both the United Kingdom and the Republic of Ireland refer to corporation law as "company" law.

to provide the basis of any conclusion about the foreign jurisdiction's law. Conversely, Respondents argue that the lower courts carefully considered the legal analysis and factual allegations before it and that there is nothing in the relevant cases, statutes, or commentary to suggest that Ireland would recognize Tomran's ability to pursue a derivative action. We again disagree with Tomran's position.

The Honorable Mr. Justice Ronan Keane, Chief Justice of Ireland, in his treatise on company law, provides a thorough explanation of the history of Irish company law:

The general structure of Irish company law is closely modeled on that of England. The reason is obvious: the two countries had a common legal tradition and, after the Act of Union in 1800 and until 1921, all statute law affecting Ireland was enacted at Westminster. While there have been substantial changes in Irish company law since 1921, it was thought better to preserve the general structure inherited from the English, and such changes as have been made since 1921 have in many instances been based on changes in the neighbouring jurisdiction. Since the accession of Ireland to the European Economic Community in 1973, however, many changes have resulted from compliance with directives of the community, now the European Union, requiring the harmonisation of company law in the member states.

Both parties agree that there is a lack of applicable statutory and case law in Ireland on the shareholders' right to maintain a derivative suit and recognize that the decisions of the English courts prior to Irish independence in 1921, although not precedential authority, are persuasive. To that end, Tomran relies upon three English cases from the nineteenth century as supporting its assertion that Irish courts would permit it to proceed: *Bagshaw v. Eastern Union Ry. Co.*, [1849] 7 Hare 114 (addressing issue of whether the directors' appropriation of monies to a project separate from that for which they were raised was proper, and limiting *Foss v. Harbottle*, [1843] 2 Hare 461, to the proposition that if the offending act by the directors is an act that the shareholders

could ratify, an action to impeach the board's action cannot be maintained); *Great Western Ry. v. Rushout,* [1852] 5 DeG. & Sm. 290, 309 (finding that beneficiaries of a trust of stock could seek an injunction to interfere with the internal management of the railway company when an unlawful application of funds is involved); and *Binney v. Ince Hall Coal & Channel Co.,* [1866] 35 L.J. Ch. 363 (determining that the equitable mortgagee of shares has the authority to sue the company to protect the value of the shares). In response, Respondents note that none of the cases cited by Tomran addresses the issue of beneficial owners' ability to sue derivatively, but rather, the cases address other rights distinct from derivative rights.

A close reading of the cases cited by the parties reveals that none of the cases cited provides any basis for the assertion that Irish courts would recognize a beneficial owner's right to maintain a derivative suit: *Bagshaw* and *Great Western* involved individuals seeking injunctions to redress alleged illegal acts by the boards, and *Binney* concerned an equitable mortgagee who sought an injunction to prevent the board from liquidating the share capital of its members.

The issue before us is not what we believe the Irish court *should* hold when faced with this issue as Tomran urges, but rather what it *would* hold based on applicable laws and precedent. As the United States Court of Appeals for the Eighth Circuit noted, "This Court must look to [foreign law] as it is and not as one might believe it ought to be." *Carson v. National Bank of Commerce Trust and Savings,* 501 F.2d 1082, 1085 (8th Cir.1974).

We cannot conclude that Irish courts would grant beneficial owners the right to sue derivatively on behalf of corporations where there is no indication, even in *dicta,* that they have considered the issue. Our determination is consistent with the conclusion of Irish legal treatises that have considered the issue. *See* The Honorable Mr. Justice Ronan Keane, Chief Justice of Ireland, COMPANY LAW (Butterworths 3d ed.2000); Robert R. Pennington, COMPANY LAW, ch. 17 (Butterworths

7th ed.1995); Patrick Ussher, COMPANY LAW IN IRELAND, ch. 8 (London: Sweet and Maxwell 1986). Only Mr. Pennington states that Irish courts would permit a beneficial owner to proceed in a derivative suit, but he did not cite to any authority supporting his assertion. Therefore, in light of the dearth of any statutory or common law authority indicating that Irish courts are disposed to recognize the right of beneficial owners to sue derivatively, we are not persuaded that an Irish court at this time would hold that Tomran can sue derivatively under Irish law.[10]

## Tomran's Motion to Amend

██ Tomran also contends that the Circuit Court abused its discretion in denying Tomran's motion to amend the first amended complaint to add the Bank of New York as an additional plaintiff and make further allegations regarding "fraud on the minority" after the Circuit Court entered its judgment. We have previously stated that an abuse of discretion will be found " 'where no reasonable person would take the view adopted by the [trial] court[ ]' . . . or when the court acts 'without reference to any guiding principles,' and the ruling under consideration is 'clearly against the logic and effect of facts and inferences before the court[ ]' . . . or when the ruling is 'violative of fact and logic.' " *Beyond Systems*, 388 Md. at 29, 878 A.2d at 583–84, quoting *Wilson v. John Crane, Inc.*, 385 Md. 185, 198, 867 A.2d 1077, 1084 (2005), quoting in turn *In re Adoption/Guardianship No. 3598*, 347 Md. 295, 312–13, 701 A.2d 110, 118–19 (1997) (citations omitted). We do not find that the trial court's decision in the present case is beyond the determination that a reasonable person would make in light of the fact that additional facts concerning "fraud on the minority" would not cure Tomran's inability to maintain a derivative action. Therefore, we conclude that the

---

**10.** Because we hold that Tomran cannot sue derivatively under Irish law, we do not reach the issue of whether Tomran can satisfy the requirements of the "fraud on the minority" rule in *Foss v. Harbottle*, [1843] 2 Hare 461.

Circuit Court did not abuse its discretion in denying Tomran's motion to amend the first amended complaint.

### Conclusion

Because "hereunder and thereunder" limits the scope of the choice of law provision in the Deposit Agreement to those rights specifically set forth in the terms of the Deposit Agreement and the Receipts, we determine that Irish law governs whether Tomran has the right to pursue a derivative suit on behalf of AIB. Based on our examination of Irish law and applicable English cases, we find that Irish law would not recognize a beneficial owner's ability to sue derivatively. Therefore, we affirm the judgment of the Court of Special Appeals.

*JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS IN BOTH COURTS TO BE PAID BY PETITIONER.*

Dissenting Opinion by BELL, C.J.

The petitioner, Tomran, Inc., and Allied Irish Bank, plc (AIB), one of the respondents, entered into a Deposit Agreement, a contract pursuant to which the petitioner acquired, and deposited, pursuant to that agreement, 4800 AIB American Depositary Receipts (ADR's), the equivalent of 9600 ordinary shares of AIB stock, with the Bank of New York. An ADR is:

> ". . . a receipt that is issued by a depositary bank that represents a specified amount of a foreign security that has been deposited with a foreign branch or agent of the depositary, known as the custodian. The holder of an ADR is not the title owner of the underlying shares; the title owner of the underlying shares is either the depositary, the custodian, or their agent. ADRs are tradeable in the same manner as any other registered American security, may be listed on any of the major exchanges in the United States or traded over the counter, and are subject to the Securities Act and the Exchange Act. This makes trading an ADR

simpler and more secure for American investors than trading in the underlying security in the foreign market.

"ADRs may be either sponsored or unsponsored. An unsponsored ADR is established with little or no involvement of the issuer of the underlying security. A sponsored ADR, in contrast, is established with the active participation of the issuer of the underlying security. An issuer who sponsors an ADR enters into an agreement with the depositary bank and the ADR owners. The agreement establishes the terms of the ADRs and the rights and obligations of the parties, such as ADR holders' voting rights."

*Pinker v. Roche Holdings Ltd.,* 292 F.3d 361, 367 (3rd Cir. 2002).

The ADR program was a "sponsored" one, developed with the active participation of AIB, the issuer of the underlying shares. Indeed, the Deposit Agreement was between AIB, the Bank of New York and "all Owners and holders from time to time of American Depositary Receipts issues hereunder." As indicated, the petitioner contracted with AIB and, pursuant to that agreement, deposited its ADR's. The deposit was with The Bank of New York, in which the legal title to the petitioner's ADR's was placed, as trustee, and the Bank of New York held them in that capacity. Those ADR's, along with those of other holders of ADR's, beneficial owners of AIB stock, similarly titled, the petitioner alleged, were offered through the Bank of New York "to obtain a listing on the New York Stock Exchange and to facilitate broad ownership of its shares by U.S. citizens such as Tomran." The Deposit Agreement contained the parties' understanding of their rights and obligations under it, as well as the terms of the ADR's. One of the provisions reflects the parties' agreement as to the law that applies in the interpretation of the agreement and the ADR's and, as well, that governs their rights under the ADR's and the agreement. That provision, § 7.6, a choice-of-law provision, provides:

"*Governing Law.* This Deposit Agreement and the Receipts shall be interpreted and all rights hereunder and thereun-

der and provisions hereof and thereof shall be governed by the laws of the state of New York."

The majority concludes that "[t]he issue of whether Tomran has a cause of action to sue derivatively on behalf of AIB is not governed by the Deposit Agreement or the ADR Receipts and thus, the choice of law clause does not apply." 391 Md. 1, 10, 891 A.2d 336, 342. This is, in its view, "[b]ecause neither the Deposit Agreement nor the Receipts by their terms provide Tomran with the right to sue derivatively." *Id.* at 17, 891 A.2d at 346. The premise for this conclusion is the majority's perception that the petitioner's argument is that the choice of law provision applied to "all rights," without regard to the Deposit Agreement and ADR's. *Id.* at 15, 891 A.2d at 345. Thus, focusing its interpretive efforts on "hereunder and thereunder," it determines that the phrase "limits the scope of the choice of law provision to the rights enumerated explicitly in the Deposit Agreement and ADR Receipts and matters of contract enforceability." *Id.* at 10, 891 A.2d at 341–42.[1]

There are two aspects of the Deposit Agreement and the ADR's that § 7.6 addresses and governs: their interpretation and the rights, "all rights," of the parties under those documents. The majority correctly holds that the rights to which the choice of laws provision refers and relates are those of the parties, under the Deposit Agreement and the ADR's. The petitioner does not, as I read its brief, argue otherwise. Indeed, it argued specifically: "[u]nder that contract (the 'Deposit Agreement'), the parties agreed to a choice-of-law provision selecting New York law to govern all possible disputes regarding Tomran's rights *both* as an ADR holder *and*

---

1. It so concluding, the majority characterized the phrase as clear and unambiguous. Be that as it may, to me, the critical phrase, "all rights" is clear and unambiguous, viewed in context and given its plain meaning. It is, for the majority, at best, ambiguous. There simply is no evidence in this record that has been presented that would permit the interpretation, as meaning less than all of the rights under the agreement and the ADR's, that the majority gives it.

under the agreement[ ]" and, stated differently, "New York law applies *not only* to interpretation of the Receipts and the Deposit Agreement, but also defines *all rights* that exist under and by virtue of ownership of the ADRs."

I do not agree with the majority's conclusion, arrived at with no apparent analysis, with respect to the scope of the rights of the parties' addressed in the Deposit Agreement or that exist pursuant to the ADR's. Section 7.6 is explicit, it governs "all rights" of an ADR holder or arising under the Deposit Agreement, not just some of those rights, *i.e.* those specifically enumerated or that relate to contract enforceability. "All rights" certainly does include such rights as are enumerated specifically and have to do with contract enforceability, but they also would include, and necessarily so, those rights that are implied or may be inferred. Because the parties agreed clearly and specifically that the interpretation of the ADR's and the Deposit Agreement, and "all rights" under them, are to be governed by New York law, and there is no agreement, express or otherwise, alleged that varies that contract, I agree with the petitioner that disputes regarding the meaning of the ADR's, the Deposit Agreement and the rights they accord are to be resolved by reference to, and consistent with, New York law.[2]

---

**2.** In this State, we favor the enforcement of choice of law provisions in contracts. *Kronovet v. Lipchin,* 288 Md. 30, 43, 415 A.2d 1096, 1104 (1980) (it is "generally accepted that the parties to a contract may agree as to the law which will govern their transaction, even as to issues going to the validity of the contract."). *See Nat'l Glass, Inc. v. J.C. Penney Props., Inc.,* 336 Md. 606, 610, 650 A.2d 246, 248 (1994). And, although this Court has adopted Restatement (Second) Conflict of Laws § 187(2) (1971), which recognizes exceptions to the general rule, *i.e.,*

"(a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties choice, or

"(b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties[,]"

neither of those exceptions apply to the case *sub judice.* The majority does not contend otherwise.

Although the majority goes to great pains to explain why the phrase, "hereunder and thereunder," limits the scope of the rights to those under the agreement and the ADR's, no such great pains are taken to explain, indeed, we are not advised as to, why the rights affected are only those "enumerated explicitly in the Deposit Agreement and ADR Receipts and [that are] matters of contract enforceability." [3] To be sure, the respondents argued that "the Deposit Agreement, including its choice-of-law provision, [is] inapplicable to issues concerning AIB's internal affairs, ... contend[ing] that the Deposit Agreement only governs the mechanics of the ADR program, including, for example, the form and transferability of receipts, cancellation and destruction of surrendered receipts, and execution and delivery of receipts." *Tomran v. Passano*, 159 Md.App. 706, 720–21, 862 A.2d 453, 461 (2004). That is not a sufficient basis and no other basis appears of record. This is especially telling in light of the majority's recognition, as it must, of our adherence to the objective law of contract interpretation and construction. As it explained, under that approach:

" 'A court construing an agreement ... must first determine from the language of the agreement itself what a reasonable person in the position of the parties would have meant at the time it was effectuated. In addition, when the

---

It should be noted that, under Restatement § 187(2):
"The law of the state chosen by the parties to govern their contractual rights and duties will be applied, even if the particular issue is one which the parties could not have resolved by an explicit provision in their agreement directed to that issue."

3. The Court of Special Appeals reached a similar result with respect to the applicability and scope of § 7.6 and with about as much analysis;
[W]e are not persuaded that the language " 'all rights hereunder and thereunder and provisions hereof and thereof,' which clearly refers respectively to the 'Deposit Agreement and the Receipts,' can be read so broadly as to reflect an intention by AIB to cede to the law of New York matters concerning its internal affairs, which most certainly would include the determination of who has the right to maintain a derivative suit."
*Tomran v. Passano*, 159 Md.App. 706, 721, 862 A.2d 453, 461–62 (2004).

language of the contract is plain and unambiguous there is no room for construction, and a court must presume that the parties meant what they expressed. In these circumstances, the true test of what is meant is not what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it meant. Consequently, the clear and unambiguous language of an agreement will not give [way] to what the parties thought that the agreement meant or intended it to mean.' "

391 Md. at 13–14, 891 A.2d at 344, quoting *General Motors Acceptance Corp. v. Daniels,* 303 Md. 254, 261, 492 A.2d 1306, 1310 (1985).

It is likely that the interpretation that the majority put on § 7.6 is the interpretation that the respondents intended, that they intended that meaning. It is not, however, the meaning that the petitioner attributed to it; it believed that its impact and effect were much broader. Thus, the petitioner submitted, citing §§ 4.1,[4]

---

4. Section 4.1 provides:
 *"Cash Distributions.*

 "Whenever the Depositary shall receive any cash dividend or other cash distribution by the Issuer on any Deposited Securities, the Depositary shall, subject to the provisions of Section 4.5, convert such dividend or distribution into Dollars and shall distribute the amount thus received to the Owners entitled thereto, in proportion to the number of American Depositary Shares representing such Deposited Securities held by them respectively; provided, however, that in the event that the Issuer or the Depositary shall be required to withhold and does withhold from any cash dividend or other cash distribution in respect of any Deposited Securities on an amount on account of taxes, the amount distributed to the owner for Depositary share representing such Deposited Securities shall be reduced accordingly. The Depositary shall distribute only such amount, however, as can be distributed without attributing to any Owner a fraction of one cent. Any such fractional amounts shall be rounded to the nearest whole cent and so distributed to Owners entitled thereto. The Issuer or its agent will remit to the appropriate governmental agency in Ireland all amounts withheld and owing to such agency. The Depositary will forward to the Issuer or its agent such information from its records as the Issuer may reasonably request to enable the Issuer or its agent to file necessary reports with governmental agencies, and either the Depositary or the Issuer or its agent may file any such reports necessary to obtain benefits under the applicable tax treaties for the Owners of Receipts."

4.7 [5] and 4.9,[6] that the Deposit Agreement gave it "equal rights to dividends, proxy information and shareholder notices,

---

5. Section 4.7 provides:
 "*Voting of Deposited Securities.*
 "Upon receipt of notice of any meeting of holders of Shares or other Deposited Securities, if requested in writing by the Issuer the Depositary shall, as soon as practicable thereafter, mail to the Owners a notice, the form of which notice shall be in the sole discretion of the Depositary, which shall contain (a) such information as is contained in such notice of meeting, and (b) a statement that the Owners as of the close of business on a specified record date will be entitled, subject to any applicable provision of irish law and the Articles of Association of the Issuer, to instruct the Depositary as to the exercise of the voting rights, if any, pertaining to the amount of Shares or other Deposited securities represented by their respective American Depositary Shares. Upon the written request of an Owner on such record date, received on or before the date established by the Depositary for such purpose, the Depositary shall endeavor in so far as practicable to vote or cause to be voted the amount of Shares or other Deposited Securities represented by such Receipt: in accordance with the instructions set forth in such request. The Depositary shall exercise the right to vote that attaches to the Shares or other Deposited Securities in accordance with such instructions provided, however, that if no such instructions are given, the Owner shall be deemed to have instructed the Depositary to vote such Shares or deposited Securities in the manner requested by the Issuer."

6. Section 4.9 provides:
 "*Reports.*
 "The Depositary shall make available for inspection by Owners at its Corporate Trust Office any reports and communications, including any proxy soliciting material, received from the Issuer which are both (a) received by the depositary as the holder of the Deposited Securities and (b) made generally available to the holders of such Deposited Securities by the Issuer. The Depositary shall also send to the Owners copies of such reports hen furnished by the Issuer pursuant to Section 5.6.
 "In addition, upon notice that the Issuer has not furnished the Commission or any securities regulatory agency or stock exchange with any public reports, documents or other information as required by foreign law or otherwise by the Securities Exchange Act of 1934, the Depositary shall furnish promptly to the Commission or such regulatory agency or stock exchange copies of all annual or other periodic reports and other notices or communications which the Depositary or the Custodian, or their respective nominees, receives as a holder of the Deposited Securities from the Issuer and which are not so furnished to or filed with the Commission or such regulatory agency or exchange pursuant to any other requirement of the Commission or such regulatory agency or exchange. The Depositary shall also furnish to the Commission semi-annually, beginning on or before

where they may cause their shares to be voted as they direct" and alleged that, pursuant to the Deposit Agreement and ADR's, it "in every relevant respect enjoy[s] the same rights and privileges of holders of AIB's ordinary shares." Consequently, the interpretation by the majority does not even capture what the parties intended, at best, deferring to the intention of only one side.

More important, an objective person in the position of the parties, who used the broadest possible language to describe the rights he or she intended to be subject to New York law, would not likely have intended that language to be restrictive, to limit the scope of the disputes that otherwise would be subject to resolution by New York law. To an objective observer, "all" means, *every one* of the rights under the Deposit Agreement and the ADR's, not just the ones that the respondents intended or the ones to which a more prudent negotiator might have restricted the agreement or even to the ones that objectively make sense. Our task is not to structure the deal for the parties in the way that is most beneficial to them. "People are permitted to enter into contracts to their disadvantage." *Shallow Run Ltd. Partnership v. State Highway Admin.,* 113 Md.App. 156, 171–72, 686 A.2d 1113, 1121 (1996).

---

six months after the effective date of any resignation statement filed with the Commission under the Securities Act of 1933 relating to the Receipts, the following information in tabular form:

"(1) The number of American Depositary Shares represented by Receipts issued during the period covered by the report;

"(2) The number of American Depositary shares represented by receipts retired during the period covered by the report;

"(3) The total amount of American Depositary Shares represented by receipts remaining outstanding at the end of the six month period;

"(4) he total number of Owners at the end of the six-month period.

"The Depositary shall also furnish the name of each dealer known to the Depositary depositing Shares against issuance of Receipts during the period covered by the report. The Issuer shall furnish the depositary with the names of each dealer known to the Issuer and the Depositary shall include in its report the names of such dealer or dealers which are supplied by the Issuer."

The more expansive meaning of "all rights," in addition to being supported by common sense, finds support in *Batchelder v. Kawamoto*, 147 F.3d 915 (9th Cir.1998), *cert. denied*, 525 U.S. 982, 119 S.Ct. 446, 142 L.Ed.2d 400 (1998). In that case, American Honda and the holder of ADR's entered into a Deposit Agreement, which, like the Deposit Agreement in this case, contained a choice-of-law provision, § 7.07. That provision provided:

"This Deposit Agreement and the [American Depository] Receipts and all rights hereunder and thereunder and provisions hereof and thereof shall be governed by and construed in accordance with the laws of the State of New York, United States of America. It is understood that notwithstanding any present or future provision of the laws of the State of New York, the rights of holders of Stock and other Deposited Securities, and the duties and obligations of the Company in respect of such holders, as such, shall be governed by the laws of Japan."

The plaintiff's derivative action, brought pursuant to the Deposit Agreement, was dismissed, the court holding that "the Deposit Agreement . . . expressly provides that the law of Japan governs shareholder rights." *Id.* at 917. It explained:

"The first sentence of § 7.07 provides that contract rights contained in the Deposit Agreement itself or in the ADR certificates, as well as the construction of the Deposit Agreement, are to be governed by the laws of New York. The second sentence of § 7.07, however, explicitly provides that Japanese law governs shareholder rights and the rights of holders of other Deposited Securities, including ADRs. Thus, if an ADR holder seeks to assert a right belonging to shareholders or a right not specifically granted to ADR holders in the Deposit Agreement, the laws of Japan apply. Section 7.07 is simply a choice-of-law clause."

*Id.* at 917–18.

Like the plaintiff in *Batchelder*, the petitioner does not contend that the Deposit Agreement, in terms, grants it, as an ADR holder, the right to bring shareholder derivative claims;

rather, it maintains its entitlement to bring a derivative action based on its status as an AIB ADR holder and, therefore, AIB shareholder. Unlike in *Batchelder*, however, there is no second sentence, the plain language of which directs the court to apply Irish law to determine the existence and scope of the petitioner's rights. In the absence of that second sentence, effect must be given to the only provision there is. And that provision admits of no exceptions or restrictions.